Paul R. Cressman, AK. Bar No. 0607046
Ahlers & Cressman PLLC
999 Third Avenue, Suite 3800
Seattle, Washington 98104
**Telephone**:    206-389-8243
**Facsimile**:    206-287-9902
**Email**:        pcressman@ac-lawyers.com

Todd C. Hayes, *Pro Hac Vice*
Charles K. Davis, *Pro Hac Vice*
Harper | Hayes PLLC
600 University Street, Suite 2420
Seattle, Washington 98101
**Telephone**:    206-340-8010
**Facsimile**:    206-260-2852
**Email**:        todd@harperhayes.com
                  cdavis@harperhayes.com

Attorneys for Plaintiff Dokoozian Construction LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| DOKOOZIAN CONSTRUCTION, LLC, an Alaska corporation, | Case No. 3:15-cv-00137-TMB |
| Plaintiff, | PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| EXECUTIVE RISK SPECIALTY INSURANCE COMPANY, a foreign insurance company; COLONY INSURANCE COMPANY, a foreign insurance company; and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a foreign insurance company, | |
| Defendants. | |

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 1

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

# I. INTRODUCTION AND RELIEF REQUESTED

This is an insurance coverage dispute arising out of a construction project. The City of Cordova was the project's owner. Plaintiff Dokoozian Construction, LLC was the general contractor. Defendants Colony and Executive Risk were Dokoozian's liability insurers.

In 2014, the City sued Dokoozian for misrepresenting the amount of a damages claim that Dokoozian had earlier submitted to the City. The City also claimed Dokoozian had failed to properly manage the construction project. Dokoozian tendered the City's claims to Colony and Executive Risk. Colony ignored the tender for more than four months, until six days before the underlying dispute was over. Executive Risk expressly denied the tender, before later reconsidering and acknowledging the City's claims had in fact triggered its duty to defend. Because neither insurer timely accepted the tender, Dokoozian requests an order that Colony and Executive Risk owed and breached their duty to defend.

Moreover, because "an insurance company which wrongfully refuses to defend is liable for the judgment which ensues even though the facts may ultimately demonstrate that no indemnity is due," Sauer v. Home Indem. Co., 841 P.2d 176, 184 (Alaska 1992), Dokoozian also requests an order that the Insurers are responsible for whatever liability Dokoozian incurred to the City in the underlying dispute (Dokoozian is not seeking a ruling regarding the *amount* of that liability).

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 2

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Also, the Policies state that Executive Risk's and Colony's respective duties to defend were triggered when the City asserted a "claim" (Executive Risk) and filed "suit" (Colony). The Policies do not state that the Insurers' defense obligations were delayed until "tender." Accordingly, Dokoozian requests an order that the Insurers are liable for all defense costs that were incurred after their respective duties to defend were triggered—March 14, 2014 for Executive Risk and April 10, 2014 for Colony—including any defense costs that were incurred "pre-tender."

Finally, Dokoozian requests an order that the measure of damages for purposes of its indemnity claim against the Insurers is the value of that portion of Dokoozian's affirmative claim *against* the City that Dokoozian gave up as consideration for the release of the City's claims against Dokoozian. Although the Alaska Supreme Court has not addressed this precise issue, courts in other jurisdictions have held that if a policyholder gives up its own claim to secure the release of covered claims against it, then the insurer must reimburse the policyholder for the value of the claim it gave up. *See, e.g.*, Earth Elements, Inc. v. National American Ins. Co. of California, 48 Cal. Rptr. 2d 399, 401 (Cal. Ct. App. 1995) ("The issue here is whether [the policyholder] is entitled to be compensated for the value of [the counterclaim] which it gave up in return for the settlement. That answer is clearly yes.").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 3

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Case 3:15-cv-00137-TMB   Document 216   Filed 06/30/17   Page 3 of 34

## II.    FACTS

### A.    THE UNDERLYING DISPUTE

In August 2010, the City of Cordova and Dokoozian entered into a written agreement for Dokoozian to serve as general contractor for the construction of "Phase I" of a community center in Cordova, Alaska. *See Declaration of Kurt Imig* ¶ 3. The Project called for Dokoozian to perform site work and to construct the foundations, superstructure, and "primary building enclosure" for the community center. *Id.* The City planned to later add electrical and mechanical systems and to complete the interior of the facility in a separate "Phase II." *Id.*

Dokoozian commenced work in September 2010 and substantially completed the window portion of its work in early September 2012. *Imig Decl.* ¶ 4. Dokoozian retained a subcontractor called Capitol Glass to provide and install a curtain wall and store front windows and to provide vinyl windows. *Id.*

In late September 2012, following a severe rain storm, the City began to complain about leaking windows. *Imig Decl.* ¶ 5. The City claimed that Dokoozian was responsible for failing to properly manage the construction. *Id.* Although Dokoozian disputed that it was at fault (and in fact believed the City's architect had mis-designed the windows), Dokoozian worked with the City throughout the spring and summer of 2013 to attempt to repair the windows. *Imig Decl.* ¶ 6. In total, Dokoozian spent approximately $727,678 on attempted window repairs. *Id.* Ultimately, the City and Dokoozian could not resolve the

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 4

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Case 3:15-cv-00137-TMB   Document 216   Filed 06/30/17   Page 4 of 34

City's complaints and, on October 28, 2013, the City ordered Dokoozian to stop all work. *Id.*

In March 2014, Dokoozian filed a demand for arbitration against the City. *Imig Decl., Ex. A.* The demand alleged $5,800,000 in damages, plus attorney's fees and interest. *Id.* Dokoozian later amended its arbitration demand to assert a claim for treble damages against the City under Alaska's Unfair Trade Practices and Consumer Protection Act ("UTPCPA"). *Imig Decl. ¶ 8; see also Imig Decl., Ex. B.* Dokoozian alleged the City had violated the UTPCPA by soliciting bids for a project while knowing the plans and specifications for that project were inadequate for accurate bidding or construction. *Imig Decl. ¶ 8.* Ultimately, Dokoozian sought over $17.4 million in damages from the City (treble its original $5.8 million claim). *Id.*

In April 2014, the City filed a counterclaim in the arbitration. *Imig Decl., Ex. C.* The one-page counterclaim—filled out on a pre-printed American Arbitration Association form—identified "expenses incurred to evaluate and repair defective work performed by Claimant" as part of the City's damages. *Id.* The City requested $1,500,000 in damages, plus attorney's fees, interest, and arbitration costs. *Id.*

In July 2014, the City filed a lawsuit against Dokoozian in Alaska Superior Court. *See Imig Decl., Ex. D.* The lawsuit alleged that Dokoozian had violated the UTPCPA by originally asserting a claim against the City for several million dollars more than the $5.8 million in (non-trebled) damages that Dokoozian was seeking in the arbitration. *Id.*

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 5

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Dokoozian successfully moved to compel arbitration of the City's UTPCPA claim, which was added to the City's other counterclaims in the arbitration. *See Imig Decl.* ¶ 12.

In November 2014, Dokoozian and the City attended a mediation. *See Imig Decl.* ¶ 13. The mediation was unsuccessful, so Dokoozian served a $3,250,000 offer of judgment on the City. *Imig Decl.* ¶ 14. The City accepted the offer on December 10, 2014, ending all litigation between the parties. *Id.* Dokoozian and the City later executed a settlement agreement that included mutual releases. *Imig Decl.* ¶ 15.

## B.  DEFENDANTS' INSURANCE POLICIES

Defendants were Dokoozian's liability insurers. Colony insured Dokoozian under an "environmental package policy" that included an "errors and omissions liability coverage part"—*i.e.*, "E&O" coverage. *See Imig Decl., Ex. E.* Executive Risk sold Dokoozian a policy that included a "directors & officers and entity liability coverage part"—so-called "D&O" coverage. *See Imig Decl., Ex. F.*

### 1.  The Colony Policy

The Colony "E&O" coverage affords liability insurance for "wrongful acts," which the policy defines to include errors and omissions in the rendering of "professional services":

> We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay as "damages" because of a "wrongful act" to which this insurance applies.
>     . . . .
>
>     "Wrongful act" means an act, error or omission in the rendering or failure to render "professional services . . . .

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 6

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

*Imig Decl., Ex. E* at 7; 5. "Professional services" are "those functions performed for others by [the insured] or on [its] behalf that are related to [the insured's] practice as a consultant, engineer, architect, surveyor, laboratory *or construction manager*." *Id.* at 4 (emphasis added).

Colony's E&O coverage further states that the insurer has a "duty to defend":

> If . . . Errors And Omissions Liability . . . is purchased and the corresponding Coverage Part is attached to these Common Policy Provisions, the following provisions apply to . . . Insuring Agreement E - Errors And Omissions Liability . . . :
>
> a. We will have the right and duty to defend the insured against any "suit" seeking "damages" to which this insurance applies.

*Imig Decl., Ex. E* at 3.

### 2. The Executive Risk Policy

The "D&O" coverage in the Executive Risk policy insures "the Organization," which is defined to include Dokoozian,[1] against "Loss" resulting from a "Claim":

> The Company shall pay, on behalf of an **Organization**, **Loss** on account of a **Claim** first made against the **Organization** during the **Policy Period**.
> . . . .
> **Loss** means the amount which an **Insured** becomes legally obligated to pay as a result of any **Claim**, including . . . **Defense Costs** . . . .

*Imig Decl., Ex. F* at 3, 9. A "Claim" is any lawsuit or written demand that is based on "a Wrongful Act," which the policy broadly defines as "any actual or alleged error,

---

[1] *See Imig Decl., Ex. F* at 10 ("[T]he definition of Organization . . . is amended to include . . . Dokoozian Construction, LLC").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 7

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

misstatement, misleading statement, act, omission, neglect, or breach of duty . . . allegedly committed or attempted by . . . any Organization." *Imig Decl., Ex. F* at 6.

In addition to defining "Loss" as including "Defense Costs," the Executive Risk policy expressly states that the insurer has a "duty to defend" covered claims:

> The Company shall have the right ***and duty*** to defend any **Claim** covered by this Coverage Part. Coverage shall apply even if any of the allegations are groundless, false or fraudulent.

*Imig Decl., Ex. F* at 7 (italics added). The Executive Risk policy further states that if an insured incurs Loss that is both covered and uncovered, all Defense Costs incurred by that insured "shall be covered Loss":

> If an **Insured** who is afforded coverage for a **Claim** incurs an amount consisting of both **Loss** that is covered by this Coverage Part and also loss that is not covered by this Coverage Part because such **Claim** includes both covered and uncovered matters, then coverage shall apply as follows:
>
> (A) Defense Costs: ***one hundred percent (100%) of Defense Costs incurred by such Insured on account of such Claim shall be covered Loss*** . . . .

*Imig Decl., Ex. F* at 8 (italics added).

## C.     HISTORY OF THE INSURANCE CLAIMS

On July 25, 2014, Marsh insurance sent notice of the City's lawsuit to Colony and Executive Risk. *See Imig Decl., Ex. G; H*. On August 20, 2014, Executive Risk responded that it was denying coverage and would not defend Dokoozian. *See Imig Decl., Ex. I* at 4 ("[E]xecutive Risk respectfully declines to accept coverage for this matter as to Dokoozian, for any **Loss**, including **Defense Costs** . . . .").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 8

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

On December 12, 2014, after follow-up calls from Dokoozian and its defense counsel, Executive Risk changed its position and agreed to "accept coverage." *See Imig Decl., Ex. J* at 1 ("[Executive Risk] will agree to amend its coverage position to accept coverage for this matter as to Dokoozian . . . ."). Executive Risk did not have any new pleading from the Underlying Dispute on December 12, 2014 that it didn't have on August 20, 2014. Rather, Executive Risk changed its position solely because the original adjuster and his supervisor reexamined the City's lawsuit and realized that it potentially alleged covered liability. *See Declaration of Todd C. Hayes, Ex. A.*

In response to the December 12 letter, Dokoozian forwarded invoices from its defense counsel in the Underlying Dispute, Ahlers & Cressman, to Executive Risk. The insurer paid three of the invoices (approximately $133,000 out of the more than $600,000 that Dokoozian had incurred). *Imig Decl. ¶ 23.* But then on April 3, 2015, Executive Risk notified Dokoozian that it would no longer pay for any of Dokoozian's defense costs. *See Imig Decl., Ex. K.* Executive Risk claimed that an "other insurance" clause in its policy rendered its coverage excess to Colony's, so Dokoozian would have to get the defense costs from Colony. *Id.*

Colony never responded substantively to the July 25, 2014 notice until the underlying dispute was essentially over. During the fall of 2014, the insurer exchanged some emails and had at least one phone call with Dokoozian representatives, but never issued a coverage position letter. *Imig Decl. ¶ 24.* In November 2014, when Colony still hadn't responded, Dokoozian's lawyer sent a letter explaining again why Dokoozian

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 9

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

believed the City's counterclaims were potentially covered and again asking for a response. *See Hayes Decl., Ex. B.*

On December 3, 2014, a Colony representative emailed Dokoozian's counsel to arrange a conference call for the following day. *Hayes Decl., Ex. C.* During that call, the Colony representative explained that the insurer had decided to participate in Dokoozian's defense. *See Hayes Decl., Ex. D* at 25:17-23. Notwithstanding Colony's commitment, it never actually paid Dokoozian's lawyers or reimbursed Dokoozian for any of the defense costs Dokoozian had already paid. *Imig Decl. ¶ 25.*

During the course of this coverage litigation, Dokoozian deposed Colony's Rule 30(b)(6) designee. The deposition notice required Colony to prepare a witness to testify regarding—among other things—"[t]he factual bases for Colony's decision not to retain defense counsel for Dokoozian *or contribute to, pay for, or reimburse the attorney's fees* or costs that Dokoozian[] incurred in the Underlying Litigation." *Hayes Decl., Ex. F.* Colony's 30(b)(6) designee claimed during the deposition that Colony never paid any of Dokoozian's defense costs because the insurer needed more information about defense counsel's invoices:

> Q. [C]olony has not paid the Ahlers & Cressman firm for any of the work it did to defend the City's lawsuit, correct?
>
> A. That is correct.
>
> Q. Okay. And Colony has not reimbursed Dokoozian for any of the money it spent to pay Ahlers & Cressman for work it did to defend the City's lawsuit, correct?
>
> A. That is correct.
>
> Q. Okay. Why not?

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

A. I believe that there's—there was discussion put back on both the law firm and the insured to get us additional information for us to better understand, you know, the separation between the pursuit of affirmative claims and the defense. And that that is part of what is ongoing right now.

*Hayes Decl., Ex. G* at 48:11 to 49:1.

But the Colony witness also testified that Colony doesn't know if anyone ever asked for that information:

Q. Okay. So you think that Colony communicated to the Ahlers & Cressman firm that it needed more information about the fees that were spent on the defense of the City's claim as opposed to Dokoozian's affirmative defense claim against the City?
. . . .
THE WITNESS: Actually, I've got to take that back. I can't remember.
. . . .

Q. [D]id Colony ever write to . . . Dokoozian and say, we need more information about allocation of defense costs versus affirmative claim attorney's fees?

A. You know, I don't recollect.

*Hayes Decl., Ex. G* at 49:3 to 49:21; 52:11 to 52:15.

Also, the witness couldn't even say whether Colony had even looked at the invoices to determine which fees it agreed were attributable to Dokoozian's defense:

Q. And there's an entry, the second 8/22/2014 entry, DRR Review Ellie Perka's comments to answer and counterclaim. Do you see that?

A. I do.

Q. And that's related solely to the defense of the City's lawsuit, correct?

A. I don't know.

Q. [H]as Colony looked at the Ahlers & Cressman invoices to determine if there are any entries that Colony agrees were for work solely to defend the City's lawsuit against Dokoozian?

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 11

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

A.  I'm not aware.

Q.  If there were entries that were solely related to Dokoozian's defense of the City's lawsuit claims, that's something that Colony could identify and pay as part of its duty to defend regardless of billing numbers, correct?

MR. BOARDMAN:  [objection lodged]

THE WITNESS:  Yes, I don't know.

BY MR. HAYES:

Q.  Why hasn't Colony paid the portion of the Ahlers & Cressman fees that Colony itself acknowledges were related solely to the defense of the City's lawsuit claims?

A.  Yeah, I don't know—I don't understand—can you repeat the question again, sorry.
    . . . .

Q.  Has Colony ever gone through the invoices to determine which entries Colony believes were related solely to the defense of the City's lawsuit against Dokoozian?
    . . . .

THE WITNESS:  I don't recall.

BY MR. HAYES:

Q.  Can you identify any reason that Colony has not paid any Ahlers & Cressman fees that it believes were related solely to the defense of the City's counterclaims?

A.  I think that's the subject of ongoing dispute, what is that number, which is the subject of this lawsuit.

***Q.  Are there some fees that Colony believes were related solely to the defense of the City's lawsuit?***

***A.  I don't know.***

*Hayes Decl., Ex. G* at 60:17 to 62:20 (emphasis added).

Nor could the witness say whether Colony had any issue with the defense lawyers'

rates:

Q.  Did Colony ever discuss with Dokoozian or Ahlers & Cressman Ahlers & Cressman's rates?

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 12

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

A. I don't recall.

Q. Did Colony have any issue with the rates?

A. I don't recall.

*Hayes Decl., Ex. G* at 72:25 to 73:8.

Finally, the witness testified that he didn't know why Colony hadn't paid at least

the portion of the fees that the insurer agreed were for defense of the City's counterclaims:

Q. Okay. Why didn't Colony pay some of the defense costs that it acknowledged were for the defense of the City's claims once it became aware that Executive Risk was not contributing?

A. I don't recall.

Q. Is there any reason that it didn't do that?

A. I don't know. I don't recall.

*Hayes Decl., Ex. G* at 77:3-9.

## III.  <u>ISSUES</u>

The issues presented by this motion are: (1) whether Colony and Executive Risk

owed and breached a duty to defend Dokoozian; (2) whether the Insurers are estopped from

denying coverage; (3) whether the Insurers are liable for defense costs incurred after their

respective duties to defend were triggered, including pre-tender defense costs; and (4)

whether Dokoozian has a claim for the portion of its affirmative claim against the City that

Dokoozian gave up to secure the release of the City's counterclaims.

## IV.  <u>EVIDENCE RELIED UPON</u>

This motion is based on the pleadings and other papers previously filed in this

matter and the declarations of Kurt Imig and Todd Hayes.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 13

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

# V.   ARGUMENT

## A.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FRCP 56(c). While evidence must be construed in favor of the non-movant, summary judgment is nevertheless appropriate if no rational fact finder could decide for the nonmoving party. Bathony v. Transamerica Occidental Life Ins. Co., 795 F. Supp. 296, 298 (D. Alaska 1992). The nonmoving party cannot rest upon the mere allegations or denials of his or her pleadings, but must instead produce sufficient evidence of specific facts—by affidavit or other evidentiary materials allowed by Rule 56(e)—showing a genuine issue for trial. Knisley v. Advancia Corp. Disability Benefits Plan, 363 F. Supp. 2d 1194, 1196 (D. Alaska 2005).  The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant.  *See, e.g.*, Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).  Evidence must be concrete, and cannot be based on "mere speculation, conjecture, or fantasy."  O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986).

## B.   COLONY OWED AND BREACHED A DUTY TO DEFEND

Under Alaska law, the duty to defend arises whenever a claim includes factual allegations that are potentially covered.  *See* Afcan v. Mut. Fire, Marine & Inland Ins. Co., 595 P.2d 638, 645 (Alaska 1979) ("[I]f the complaint [o]n its face alleges facts which,

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 14

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

standing alone, give rise to a possible finding of liability covered by the policy, the insured has the contractual right to a proper defense at the expense of the insurer.").  The insurer must defend unless there is "no possible basis on which the insurer would be required to indemnify."  *See* Ivey v. Am. Home Assur. Co., 3:03-CV-0202-TMB, 2006 WL 1452686, at *3 (D. Alaska May 19, 2006).  Once the duty is triggered, the insurer's refusal to defend or failure to pay defense costs is a breach of its duty.  *See* Brannon v. Cont'l Cas. Co., 137 P.3d 280, 285 (Alaska 2006) ("An insurance company therefore breaches the duty to defend when it refuses to defend the insured."); Attorneys Liab. Prot. Soc'y, Inc. v. Ingaldson & Fitzgerald, P.C., 3:11-CV-00187-SLG, 2012 WL 6675167, at *3 (D. Alaska Dec. 21, 2012) ("[A]n insurer's obligation to provide independent counsel necessarily includes an obligation to pay for that counsel, without a right to reimbursement from the insured.").  An insurer need not expressly refuse to defend in order to breach its duty to defend—failure to pay defense costs once the duty has been triggered is a breach.  *See, e.g.*, Newmont USA Ltd. v. Am. Home Assur. Co., 676 F. Supp. 2d 1146, 1161 (E.D. Wash. 2009) ("It is undisputed that INA never responded in writing whether it was either agreeing to or declining to defend the Plaintiffs. . . .  Accordingly, the court finds there are no material facts in dispute as to whether INA breached its duty to defend.").[2]

---

[2]    *See also* Kirby v. Hartford Cas. Ins. Co., 2004 U.S. Dist. LEXIS 11736 (N.D. Texas, June 10, 2004) ("[T]he law does not require that Hartford 'conclusively determine' its duty to defend.  Hartford breached the policy by delaying after its duty to defend became reasonably certain."); Holt v. Utica Mut. Ins. Co., 759 P.3d 623, 628-29 (Ariz. 1988) ("Even absent an express refusal to defend, an unreasonable delay in taking action after receiving notice of a claim may constitute a breach of the duty to defend."); Municipality of San Juan v. Great American Ins. Co., 813 F.2d 520, 521 (1st Cir. 1987) ("[Insurer's] failure to promptly notify the [insured] of the insurer's willingness to defend amounted to a refusal to defend and, thus, a breach of the duty to defend."); McFarland v. First American Title Ins. Co., 595 F. Supp. 630, 635 (D. Mont. 1984) (insurer breached duty to defend "when it failed to assume [insured's]

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 15

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Colony owed a duty to defend because its policy covers liability for a "wrongful act," which is "an act, error or omission in the rendering or failure to render "professional services.'" "Professional services" are in turn defined as "those functions performed for others by [the insured] or on [its] behalf that are related to [the insured's] practice as a . . . **construction manager**." *Imig Decl., Ex. E* at 4 (emphasis added).

In <u>Bayley Constr. v. Great American</u>, 980 F. Supp. 2d 1281 (W.D. Wash. 2013), the claim underlying the parties' insurance dispute alleged that the insured was serving as the prime contractor on a construction project, that a subcontractor had failed to pay its workers prevailing wages, and that the insured was liable for that failure. <u>Bayley Constr.</u>, 980 F. Supp. 2d at 1287. The court interpreted the policy term "professional services," which, like here, was defined to include "construction management," as encompassing conduct by the insured in overseeing its subcontractors. *Id.* at 1288–90, 1288 n.4 (noting that tracking subcontractors' wage payments constituted professional services because that was "part of [the insured's] day-to-day business operations in its profession as a general contractor"). Because the insured was the general contractor and its responsibilities included paying for labor, the court found that ensuring subcontractors paid their workers was a "professional service" potentially covered by the policy, thus triggering the insurer's duty to defend. *Id.*

---

defense within a reasonable time after receiving notice," notwithstanding fact that insurer "eventually did assume [insured's] defense); <u>Long Island Lighting Co. v. Steel Derrick Barge FSC 99</u>, 725 F.2d 839, 842 (2nd Cir. 1984) (failure to respond constitutes "refus[al] to defend").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 16

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Here, the City's lawsuit alleged that Dokoozian violated the UTPCPA by requesting too much additional compensation, some of which was for subcontractors. The City's claims addressed the parties' general contract, which required Dokoozian to "supervise and direct the Work"; "provide and pay for labor, materials, equipment, tools"; control the "construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work"; and "require each Subcontractor . . . to be bound to the Contractor . . . and to assume toward the Contractor all the obligations and responsibilities." *Imig Decl., Ex. L* at 2. As in <u>Bayley</u>, "construction management" could reasonably be interpreted to encompass Dokoozian's duties to pay subcontractors and make claims on their behalf. Thus, the City's allegations potentially arose out of Dokoozian's "construction management" duties in that they related to the evaluation, preparation, and submission of Dokoozian's allegedly-inflated claim on behalf of subcontractors. Colony therefore had a duty to defend Dokoozian from the City's lawsuit.

Colony breached that duty by not timely responding to Dokoozian's tender and by not timely paying Dokoozian's defense costs. It is undisputed that Colony did not substantively respond to Dokoozian's tender until December 4—more than four months after the tender and just six days before the Underlying Dispute resolved. It is also undisputed that Colony has never paid a cent of Dokoozian's defense costs. Thus, although Colony never expressly denied it had a duty to defend (and in fact ultimately admitted otherwise), Colony did not timely honor that duty, and therefore breached it.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 17

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Colony's complaints in this lawsuit[3] about the rates of Dokoozian's defense counsel don't excuse that breach. Colony never paid *anything* in defense costs—not even the amount that Colony agreed was reasonable. So unless Colony contends that the reasonable cost of defending the City's counterclaims was nothing, or that zero dollars per hour constitutes a reasonable defense counsel rate, Colony's failure to reimburse Dokoozian anything constitutes a breach.

That failure is particularly galling because no one at Colony even bothered to look at the invoices to determine which ones the insurer agreed were payable:

> Q. [H]as Colony looked at the Ahlers & Cressman invoices to determine if there are any entries that Colony agrees were for work solely to defend the City's lawsuit against Dokoozian?
>
> A. I'm not aware.
> . . . .
> Q. Has Colony ever gone through the invoices to determine which entries Colony believes were related solely to the defense of the City's lawsuit against Dokoozian? . . . .
>
> THE WITNESS: I don't recall.

*Hayes Decl., Ex. G* at 62:3 to 62:9; 60:25 to 61:4.

Colony is bound by these non-answers; it can't now claim that it knows what invoices were or were not related to the defense of the City's lawsuit. *See, e.g.*, Yeager v. Bowlin, 693 F.3d 1076, 1080–81 (9th Cir. 2012) ("[A] district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not

---

[3]    Colony never said anything about Dokoozian's defense counsel's rates during the Underlying Dispute. Only after Dokoozian sued the insurer did it contend that defense counsel's rates were unreasonable. *See, e.g.*, *Dkt. 104* at 11.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 18

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

remember."); Wilson v. Lakner, 228 F.R.D. 524, 530 (D. Md. 2005) ("[T]he testimony given by the non-responsive deponent (*e.g.* 'I don't know') may be deemed 'binding on the corporation' so as to prohibit it from offering contrary evidence at trial.").[4]

## C. EXECUTIVE RISK OWED AND BREACHED A DUTY TO DEFEND

Executive Risk likewise owed a duty to defend Dokoozian from the City's claims. The City alleged in its Superior Court lawsuit that Dokoozian violated the UTPCPA by filing a claim with the City that exceeded what Dokoozian ultimately sought in its arbitration demand. That constitutes a "wrongful act," which the Executive Risk policy broadly defines as any "alleged . . . misleading statement . . . allegedly committed or attempted by . . . any Organization." Thus, the City's claims were potentially covered, and Executive Risk owed a duty to defend against them.

Executive Risk admitted as much in its December 12, 2014 letter:

> In light of the foregoing, this will confirm that, Executive Risk, following our review of the information contained in the copies of the written materials provided to us, will agree to amend its coverage position to accept coverage for this matter as to Dokoozian Construction, LLC under Entity Liability Coverage Insuring Clause I.(C) of the D&O and Entity Liability Coverage Part of the Policy, subject to the following reservation of rights and satisfaction of the applicable $15,000 Retention.

---

[4]    *See also* Aldridge v. Lake Cnty. Sheriff's Office, 11 C 3041, 2012 WL 3023340, *5 (N.D. Ill. July 24, 2012) ("Regardless of whether defendant failed to prepare its witnesses, or whether there was a genuine lack of knowledge, defendant will not be able to take a position at trial on those issues where one of its Rule 30(b)(6) designees did not provide testimony.); Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A., 69 Fed. R. Serv. 3d 986 (N.D. Tex. 2007) ("Federal courts have interpreted this rule as prohibiting a 30(b)(6) representative from disclaiming the corporation's knowledge of a subject at the deposition and later introducing evidence on that subject."); Ierardi v. Lorillard, Inc., CIV. A. 90-7049, 1991 WL 158911 (E.D. Pa. Aug. 13, 1991) ("If the designee testifies that H & V does not know the answer to plaintiffs' questions, H & V will not be allowed effectively to change its answer by introducing evidence during trial. The very purpose of discovery is 'to avoid trial by ambush.'").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 19

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

*Imig Decl., Ex. J* at 1.

Executive Risk breached that duty not only by failing to timely accept Dokoozian's tender, but also by expressly denying it. The impropriety of Executive Risk's September denial is further confirmed by the insurer's about-face in December. Executive Risk had no new facts in December. The City's complaint against Dokoozian hadn't changed. The policy language hadn't changed. The same "eight corners" of these documents that led Executive Risk to agree to defend in December should have prompted a *timely* defense. The fact that Executive Risk ultimately recognized its error in December simply verifies that the insurer breached its duty to defend by not timely agreeing to defend back in July or August.

Executive Risk breached its duty to defend a second time when it stopped paying defense costs based on its policy's "other insurance" clause. Contrary to Executive Risk's assertion when it ceased paying, an "other insurance" clause only affects an insurer's rights against another insurer; the clause has no bearing on the insurer's duties to its policyholder:

> [A]pportionment among multiple insurers must be distinguished from apportionment between an insurer and its insured. When multiple policies are triggered on a single claim, the insurers' liability is apportioned pursuant to the "other insurance" clauses of the policies or under the equitable doctrine of contribution. ***That apportionment, however, has no bearing upon the insurers' obligations to the policyholder.***

<u>Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.</u>, 45 Cal. App. 4th 1, 105-06, 52 Cal. Rptr. 2d 690 (1996) (emphasis added).

Thus, an "other insurance" clause is relevant only "to [the insurer's] obligation to contribute to a settlement or judgment, not to its duty to defend":

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 20

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Vermont takes the position that . . . the operation of the "other insurance" clauses transforms the Vermont policy into an "excess policy" and relieves it of its contractual duty to defend.

This argument reflects a fundamental misunderstanding of the nature and purpose of "other insurance" clauses that, like the ones involved here, make no reference to the insurers' defense obligations. . . .[5]

[R]egardless of how the "other insurance" clauses may have operated in the event that both Vermont and Preferred were required to indemnify Joseph, they have no bearing on Vermont's concurrent duty to defend him. When a primary policy is not a true excess policy, but merely "is deemed 'excess' by virtue of other collectible insurance, *the limiting language is directed to its obligation to contribute to a settlement or judgment, not to its duty to defend*."

Preferred Mut. Ins. Co. v. Vermont Mut. Ins. Co., 32 N.E.3d 336, 343 (Mass. Ct. App. 2015) (emphasis added, citations omitted).[6]

This is true notwithstanding the clause's use of the word "excess." As numerous

courts have recognized, an "other insurance" clause does not transform a primary policy

---

[5]  Executive Risk's "other insurance" clause similarly says nothing about not owing a duty to defend in certain situations; the clause simply says that Executive Risk's coverage "shall be excess of and shall not contribute with such other insurance" in certain situations. *See Imig Decl., Ex. F* at 8. Even if Executive Risk's "other insurance" clause did address its duty to defend, the clause would still not affect Executive Risk's duties to Dokoozian, as opposed to allowing it contribution rights. *See* Nautilus Ins. Co. v. Lexington Ins. Co., 321 P.3d 634, 648 (Hawai'i 2014) ("'Other insurance' clauses purporting to relieve the insurer of the duty to defend if the insurer becomes excess as to liability are enforceable, but only in an action between two or more insurers for recovery of defense costs.").

[6]  *See also* Nautilus, 321 P.3d at 646 ("If a primary insurer is tendered a defense, and believes that it is actually an excess insurer or otherwise has no duty to defend by operation of its "other insurance" clause, then that primary insurer must still defend in the action."); Pac. Indem. Co. v. Linn, 590 F. Supp. 643, 652 n.10 (E.D. Pa. 1984) *aff'd*, 766 F.2d 754 (3rd Cir. 1985) ("The duty to defend is unaffected by an 'other insurance' clause because, unless stated otherwise, that obligation is independent of liability and any limitations thereon."); Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc., 513 F. Supp. 2d 157, 169 (M.D. Pa. 2007) ("An insurer's duty to defend is 'independent of liability and any limitations thereon.' Accordingly, other insurance provisions cannot remove an insurer's duty to defend, and the provision has no effect upon Westport's duty in the instant case.") (citations omitted); Platinum tech., inc. v. Fed. Ins. Co., No. 99 C 7378, 2000 WL 875881, at *6 (N.D. Ill. June 28, 2000) ("other insurance" clause not applicable to duty to defend "[b]ecause it is rather unlikely that an insurance company would be listed in the underlying complaint," yet court must determine existence of duty to defend from allegations in underlying complaint).

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 21

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

like Executive Risk's into "excess insurance," so it doesn't excuse the insurer from its duty to defend its policyholder.

CNA Ins. Co. v. Selective Ins. Co., 807 A.2d 247 (N.J. Super. 2002), is illustrative. That case arose out of a car accident involving a driver who was working as a real estate agent. One insurer (Selective) issued the driver's personal insurance. Another insurer (CNA) insured the driver's employer. The "other insurance" clause in the CNA policy stated its coverage was "excess to other available insurance." CNA, 807 A.2d at 248. The appellate court framed the threshold issue as: "whether the relationship between CNA and Selective is that of co-primary insurers, or whether Selective's coverage was primary, and CNA's coverage was excess due to its 'other insurance' clause." CNA, 807 A.2d at 252. If CNA was not excess, the court reasoned, then "each ha[d] a primary obligation to defend." CNA, 807 A.2d at 252.

Like Executive Risk claims here, CNA argued that its "other insurance" clause rendered its coverage excess, such that it had no obligation to pay defense costs until Selective's policy had been exhausted. See CNA, 807 A.2d at 253. The CNA court rejected the claim, concluding that an "other insurance" clause in a primary policy does not render the coverage "excess" *as to the policyholder*, and the insurer therefore "remains charged with all of its obligations to its insured that are concomitant with providing primary coverage." CNA, 807 A.2d at 255.

The court's discussion merits quoting at length:

> Generally, "[a]n excess policy provides protection to an insured for liability for an amount above, or in excess of, the maximum coverage

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 22

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

supplied by the primary policy." A distinction has been drawn, however, between a primary insurance policy containing an excess "other insurance" clause, and a true excess policy.

The purpose of the excess policy is to protect the insured "in the event of a catastrophic loss in which liability exceeds the available primary coverage." A true excess policy provides coverage conditioned upon the existence of a primary policy; the coverage does not begin until a loss exceeds a specific level; and the insured is usually committed to maintaining the primary insurance.

Customarily, *a true excess policy* includes a requirement for underlying primary insurance in a specific sum, *and lists the underlying primary insurance*.[7] A true excess policy also requires that the same insured must have purchased the underlying coverage for the same risk. Excess policies "expand the amount, but not the scope of coverage." Ibid. (citations and internal quotations omitted).

On the other hand, a primary policy with an "excess other insurance clause" is a device which allows the "primary insurer [to] attempt [ ] to limit or eliminate its liability where another primary policy covers the risk." . . . However, *a primary insurance policy that contains an excess "other insurance" clause does not "transform that primary policy into an excess policy."*

. . . .

Consequently, *CNA remains charged with all of its obligations to its insured that are concomitant with providing primary coverage.*

CNA, 807 A.2d at 253-55 (emphasis added, citations omitted).[8]

---

[7] The Executive Risk policy does not identify the Colony policy as underlying insurance.

[8] *See also, e.g.*, Preferred Mut. Ins. Co. v. Vermont Mut. Ins. Co., 32 N.E.3d 336, 343 (Mass. Ct. App. 2015) ("When a primary policy is not a true excess policy, but merely 'is deemed "excess" by virtue of other collectible insurance, the limiting language is directed to its obligation to contribute to a settlement or judgment, not to its duty to defend.'") (citations omitted); Travelers Prop. Cas. Co. of Am. v. Cont'l Ins. Co. of New Jersey, No. CIV.A. 10-6320 FLW, 2014 WL 4105487, at *4 (D.N.J. Aug. 19, 2014) (because policy with "other insurance" clause was "not a 'true' excess policy" in that it was not "issued as excess to another primary policy," insurer owed to its policyholder "a primary duty to defend"); Nautilus Ins. Co. v. Lexington Ins. Co., 321 P.3d 634, 653 (Haw. 2014) (insurer purporting to be excess because of "other insurance" clause "has the duty to defend, from the time it receives tender of the defense").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 23

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Case 3:15-cv-00137-TMB   Document 216   Filed 06/30/17   Page 23 of 34

Although Alaska's courts appear not to have addressed this exact issue, the above principles are consistent with <u>Providence Washington Ins. Co. of Alaska v. Alaska Pacific Assur. Co.</u>, 603 P.2d 899 (Alaska, 1979). In that case, the insurer of the lessor of a dump truck sued the insurer of the truck's lessee. The parties disputed their obligations arising out of an accident involving the truck. The trial court ruled that although the policies' other insurance clauses rendered the lessor's insurer primary as to damages, "***each party had a duty to defend***." <u>Providence</u>, 603 P.2d at 901 (emphasis added). The Alaska Supreme Court affirmed the trial court on all grounds.

Thus, regardless of whether Executive Risk's "other insurance" clause makes it excess of Colony's coverage for purposes of apportioning the insurers' *indemnity* obligations, the clause did not absolve Executive Risk of its duty to defend. It follows that Executive Risk breached that duty (a second time) when it refused to pay defense costs based on its "other insurance" clause.

## D. THE INSURERS' BREACH OF THEIR DUTY TO DEFEND ESTOPS THEM FROM DENYING COVERAGE

When an insurer wrongfully refuses to defend its policyholder, the insurer is liable for the claim regardless of whether the insurer would have owed a duty to indemnify under the terms of its policy—*i.e.*, the insurer is estopped from denying coverage. *See, e.g.*, <u>Sauer</u>, 841 P.2d at 184 ("[A]n insurance company which wrongfully refuses to defend is

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 24

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Case 3:15-cv-00137-TMB   Document 216   Filed 06/30/17   Page 24 of 34

liable for the judgment which ensues even though the facts may ultimately demonstrate that no indemnity is due.").[9]

Sauer arose out of a liability insurer's failure to defend an underlying property damage dispute. The case resulted in a verdict against the policyholder, who later declared bankruptcy. The estate's bankruptcy trustee sued the liability insurer, arguing it was "estopped from denying coverage because it failed to defend." Sauer, 841 P.2d at 180. The trial court denied the motion, held the underlying claim was not covered, and dismissed the trustee's suit.

The Alaska Supreme Court reversed. After explaining that the underlying claim was potentially covered and thus triggered the insurer's duty to defend, the court turned to the estoppel issue. The court held the insurer "[could] not contest coverage," rendering it liable for the entire judgment against the policyholder:

> We hold, as a matter of law, that Home Indemnity may not contest coverage in Gross' action on the policy, and that it is liable for the entire amount of the judgment entered against Gross, as well as costs and attorney's fees incurred in the defense of the residents' action.
>
> This holding is mandated on the authority of Theodore v. Zurich Gen. Accident & Liab. Ins. Co., 364 P.2d 51 (Alaska 1961). In Theodore we stated in part:
>
> > Since Zurich had the obligation to defend and refused to do so, the judgment became binding against it both as to the extent and

---

9   See also Makarka ex rel. Makarka v. Great American Ins. Co., 14 P.3d 964, 969 (Alaska 2000) ("Our duty-to-defend cases have established . . . failure to defend gives rise to an indemnity remedy, even if it could later be proved that no coverage was due."); Theodore v. Zurich General Acc. & Liability Ins. Co., 364 P.2d 51, 56 (Alaska 1961) ("Zurich became liable for the amount of the judgment because this was the natural consequence of its breach of the insurance contract."); Flannery v. Allstate Ins. Co., 49 F. Supp. 2d 1223, 1227 (D. Colo. 1999) (citing Sauer in support of assertion that Alaska is among jurisdictions holding "an insurer who breaches its duty to defend is precluded from raising coverage defenses").

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 25

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

existence of liability. Therefore, it did not have the right, when appellants brought this suit on the judgment, to show that the death of Arthur Theodore was not caused by the employee's liability section of the policy.

*Id* at 56. ***Thus, an insurance company which wrongfully refuses to defend is liable for the judgment which ensues even though the facts may ultimately demonstrate that no indemnity is due***. The trial court erred in denying Gross' motion for summary judgment against Home Indemnity and in granting summary judgment for Home Indemnity.

Sauer, 841 P.2d at 183-84 (citations omitted, emphasis added).

Accordingly, this Court should order not just that the Insurers are liable for Dokoozian's unpaid defense costs, but that the Insurers are also estopped from denying coverage for whatever liability Dokoozian incurred to the City in the Underlying Dispute.

**E.    THE INSURERS ARE LIABLE FOR PRE-TENDER DEFENSE COSTS DATING BACK TO THE DATES THE INSURERS' RESPECTIVE DUTIES TO DEFEND WERE TRIGGERED**

The Insurers are liable for defense costs from the date their respective duties to defend were triggered, including defense costs incurred before the July 25, 2014 tender date. These triggering dates are based first of all on the plain language of the Policies. The Colony Policy imposes a "duty to defend the insured against any 'suit' seeking 'damages' to which this insurance applies." *Imig Decl. Ex. E* at 3. A "suit" is any "civil proceeding in which 'damages' resulting from . . . a 'wrongful act' are alleged," including "[a]n arbitration proceeding in which such 'damages' are claimed and to which the insured must submit." *Id.* at 4, 5. Executive Risk's policy requires it to pay, among other things, "Defense Costs . . . incurred in investigating, defending, opposing or appealing any Claim."

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 26

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Case 3:15-cv-00137-TMB   Document 216   Filed 06/30/17   Page 26 of 34

*Imig Decl. Ex. F* at 5. A "claim" is, among other things, a "written demand . . . for monetary or non-monetary relief." *Id.* at 4.

Thus, Colony had a duty to defend as of April 10, 2014, the date the City filed its counterclaim in the arbitration (*i.e.*, an "arbitration proceeding" to which Dokoozian had to submit) alleging damages for "wrongful acts" (*i.e.*, mismanagement of the construction project, resulting in delays and the need to repair windows). Executive Risk had to defend as of March 14, 2014, the date the City issued its first mediation brief alleging violations of Alaska's UTPCPA (*i.e.*, a "written demand" alleging "wrongful acts" potentially covered by the Executive Risk policy).

Notwithstanding this policy language, the Insurers have argued that Dokoozian is entitled only to the defense costs that it incurred after the July 25, 2014 tender date. But nowhere do the Policies mention "tender." Rather, the Policies state that Executive Risk had to defend once a "claim" was made, and that Colony had to defend once a "suit" was initiated. That reading is consistent with Alaska law, which states that the duty to defend arises as soon as a potentially covered claim is initiated. *See*, *e.g.*, Great Am. Assurance Co. v. Alaska State Fair, Inc., No. 3:11-CV-0185-TMB, 2014 WL 12527211, at *8 (D. Alaska Mar. 21, 2014) ("[A]n insurer's duty to defend arises when the insured is named in a complaint that alleges facts that give rise to a possible finding of liability covered by the policy."). In other words, although a "tender" gives *notice* to the insurer that its duty to defend is extant, the tender is not what triggers the duty. *See* Brannon v. Cont'l Cas. Co.,

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 27

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

Case 3:15-cv-00137-TMB   Document 216   Filed 06/30/17   Page 27 of 34

137 P.3d 280, 286 (Alaska 2006) ("An insurance company has notice of a potential duty to defend when the insured tenders the defense.").

Griffin v. Allstate Ins. Co., 29 P.3d 777 (Wash. Ct. App. 2001), is instructive. In that case, the trial court ruled that Allstate had a duty to defend its policyholders (the Griffins) in an underlying lawsuit, but awarded them only the fees and costs they incurred after they tendered. Griffin, 29 P.3d at 780. The appellate court reversed, holding the trial court "erred in failing to award pre-tender defense expenses." Griffin, 29 P.3d at 783. The Griffin court reasoned that the policy stated the duty to defend existed as of the date the underlying lawsuit was filed, so the tender date was relevant only in deciding whether the insured had complied with its notice obligations—something that required proof of prejudice: "In Washington, the duty to defend arises upon the filing of a covered complaint, and the duty is not excused by late notice unless the insurer is prejudiced." Griffin, 29 P.3d at 78. The court concluded that because Allstate had not demonstrated prejudice, the notice didn't relieve Allstate from paying all the post-suit defense costs, including pre-tender ones.

As in Washington, the duty to defend arises under Alaska law at the time the claimant files a potentially covered claim, not when the insured tenders. See Sauer, 841 P.2d at 183 n.10; Alaska State Fair, 2014 WL 12527211, at *8. And like Washington, Alaska requires insurers to demonstrate prejudice from alleged violations of policy conditions before escaping liability. See Weaver Bros. v. Chappel, 684 P.2d 123, 125 (Alaska 1984) ("In the absence of prejudice, regardless of the reasons for the delayed

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 28

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

notice, there is no justification for excusing the insurer from its obligations under the policy.").

Here, the fact that both Insurers failed to timely agree to defend proves that the July 2014 tender date didn't prejudice them. In other words, because they didn't timely accept the defense anyway, an earlier tender wouldn't have changed anything. *Cf.* Shell Oil Co. v. Winterthur Swiss Ins. Co., 15 Cal. App. 4th 715, 763, 15 Cal. Rptr. 2d 815 (1993) (rejecting late notice defense where coverage was denied because "earlier notice would only result in earlier denial of coverage."); Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co., 433 F. Supp. 933, 952 (N.D. Ind. 2005) ("When an insurer takes no action beyond an assertion that the underlying claim is not covered by the policy, no prejudice has occurred by late notice because 'earlier notice would only result in an earlier denial of coverage.'"). Thus, the Court should issue an order that the Insurers are liable for all recoverable[10] defense costs, including pre-tender ones, incurred after the dates that their respective policies promised a defense: March 14, 2014 for Executive Risk and April 10, 2014 for Colony.

## F.   DOKOOZIAN HAS A CLAIM AGAINST THE INSURERS FOR THE PORTION OF ITS AFFIRMATIVE CLAIM THAT IT GAVE UP TO SECURE THE RELEASE OF THE CITY'S COUNTERCLAIMS

Dokoozian settled the City's counterclaims by reducing its affirmative claim against the City. Dokoozian originally sought over $17 million in damages, but settled for

---

[10]   Dokoozian is not requesting a ruling about the *amount* of the Insurers' defense cost liability or whether any particular Ahlers & Cressman billing was in fact a "defense cost."

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 29

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

$3.25 million. In exchange, the City released its roughly $3 million in counterclaims.

Thus, Dokoozian "paid" with the reduction of its own affirmative claim to settle potentially

covered counterclaims. This Court should rule that to the extent the fact-finder agrees with

these assertions,[11] the Insurers are liable for the amount by which Dokoozian had to reduce

its affirmative claim to secure the release of the City's counterclaims.

This is an issue that the Alaska Supreme Court has not yet addressed, so this Court

should "endeavor to predict how the Alaska Supreme Court would decide the issue were it

presented to that court." U.S. v. CNA Financial Corp., 381 F. Supp. 2d 1088, 1097 (D.

Alaska 2005). The Court should "start[] with the basic proposition that the Alaska Supreme

Court would 'adopt the rule of law that is most persuasive in light of precedent, reason,

and policy.'" Id. (quoting Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

That "most persuasive" rule of law is set forth in Earth Elements, Inc. v. National

American Ins. Co. of California, 48 Cal. Rptr. 2d 399 (Cal. Ct. App. 1995), *review denied*,

(1996). In that case, a policyholder had been sued in an underlying lawsuit in which it

asserted a counterclaim. When the policyholder's liability insurer refused to defend, the

policyholder settled the case by dismissing its counterclaim. The policyholder then sued

its insurer for coverage, claiming the insurer was liable for the value of the counterclaim

that the policyholder used to "pay" the settlement. The California Court of Appeals agreed:

---

[11] Dokoozian is not asking the Court to rule that Dokoozian did in fact reduce its affirmative claim to "pay" the City, the amount of the reduction, or whether the Policies cover the counterclaims. Dokoozian is merely asking the Court to resolve the purely legal issue of whether a policyholder has a claim for the "chose in action"—or portion thereof—that the policyholder gave up to secure the release of an allegedly covered claim against the policyholder.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 30

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

The issue here is whether [policyholder] is entitled to be compensated for the value of that which it gave up in return for the settlement. That answer is clearly yes.

     . . . .

A chose in action was given as consideration for a settlement. There is no analytical distinction between surrendering money in exchange for a settlement and exchanging any other item of value. While the value of money is apparent on its face, an intangible item is equally capable of being evaluated. Whether the insured gave up money or a chose in action, the consideration for the settlement had a value which is compensable because of the breach of the contractual duty to indemnify. [Policyholder] is entitled to be compensated for the value of the consideration paid in settlement of the third party claim.

Earth Elements, 48 Cal. Rptr. at 401-02.

Applying this same reasoning, the Ninth Circuit recently held that the value of a judgment surrendered in an underlying case by two policyholders was the presumptive measure of damages in their coverage dispute:

The surrender of a judgment may constitute consideration recoverable as compensatory damages. Therefore, the district court erred in dismissing the Morgans' claim that they are entitled to reimbursement for the $30,096.64 judgment they surrendered to Dimiceli as part of their settlement of Dimiceli's claims.

Morgan v. Chicago Title Ins. Co., 230 Fed. App'x. 656, 658 (9th Cir. 2007).[12]

As one insurance commentator put it, an insured's loss may be "more than he or she is out of pocket":

     Frequently, in settling a lawsuit, an insured not only will make a cash payment, but will agree to forgo a claim that the insured was asserting

---

[12] *See also* Stargatt v. Fidelity & Cas. Co. of New York, 67 F.R.D. 689, 690 (D. Del. 1975) (holding primary insurer's payment of $135,000, when added to the release of a $650,000 counterclaim, constituted exhaustion of primary insurer's $300,000 policy limits, so as to trigger excess policy); Thane Int'l, Inc. v. Hartford Fire Ins. Co., 2009 WL 453106, at *6 (C.D. Cal. Feb. 19, 2009) (fair market value of goods relinquished in consideration for settlement of claims against policyholder recoverable as damages arising from insurer's breach).

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 31

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

or could have asserted against the other party. The amount of the insured's loss, under those circumstances, may be more than the amount he or she is out of pocket. It is that amount increased by the value, if any, of the claim that was given up.

> For example, if the settlement figure was $100,000, but would have been $200,000 if the insured had not waived an affirmative claim, the insurer should, assuming a $200,000 settlement figure would not have been unreasonable, be liable for $200,000.

Allan D. Windt, *Insurance Claims and Disputes* § 6:30, at 6-302 to 6-303 (6th Ed. 2013).

In this case, Dokoozian was asserting a $17.4 million claim against the City at the same time the City was suing Dokoozian for roughly $3 million in counterclaims. Dokoozian reduced its claim against the City to get those counterclaims dismissed. As in Earth Elements, Dokoozian surrendered (a portion of) its own "chose in action" to "pay" the City. Considered another way, had Dokoozian not given up a portion of its claim against the City, the City would have required Dokoozian to pay the City cash to resolve the City's counterclaims—cash that the Insurers may have owed a duty to pay on Dokoozian's behalf. The Court should follow the reasoning of Earth Elements and hold that to the extent the fact-finder determines Dokoozian reduced its claim against the City to pay covered counterclaims by the City, the Insurers are liable for the amount of that reduction.

## VI.    CONCLUSION

The Court should issue an order that (1) Colony and Executive Risk owed and breached a duty to defend Dokoozian; (2) the Insurers are estopped from denying coverage; (3) the Insurers are liable for defense costs from the dates their respective duties to defend were triggered, including pre-tender defense costs; and (4) Dokoozian may seek indemnity

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 32

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

for the portion of its affirmative claim against the City that Dokoozian released to settle the City's counterclaims.

DATED this 30th day of June 2017.

HARPER | HAYES PLLC


By: s/*Todd C. Hayes*
     Todd C. Hayes, *Pro Hac Vice*

AHLERS & CRESSMAN PLLC


By: s/*Paul R. Cressman*
     Paul R. Cressman, AK Bar No. 0607046
     Attorneys for Plaintiffs

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 33

**Case No. 3:15-cv-00137-TMB**
Dokoozian v. Executive Risk, et al.

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the United States that on the below date I served this document on the following parties and counsel of record in the manner indicated:

| | |
|---|---|
| **Attorneys for Defendant Executive Risk Specialty Insurance Company** | **Attorneys for Executive Risk Specialty Insurance Company** |
| Rebecca J. Hozubin | Janet R. Davis |
| Hozubin, Moberly, Lynch & Associates | Gary L. Gassman |
| 711 M Street, Suite 2 | Cozen O'Connor |
| Anchorage, Alaska 99501 | 123 North Wacker Drive, Suite 1800 |
| | Chicago, IL 60606 |

☒ Via USDC CM-ECF system        ☒ Via USDC CM-ECF system

☐ Via U.S. Mail        ☐ Via U.S. Mail

☐ Via Messenger        ☐ Via Messenger

☐ Via email: rebecca@akdefenselaw.com        ☐ Via email: jrdavis@cozen.com

        ☐ Via email: ggassman@cozen.com

| | |
|---|---|
| **Attorneys for National Union Fire Insurance Company of Pittsburgh, Pa** | **Attorneys for Defendant Colony Insurance Company** |
| Jason Kettrick | |
| Jeffrey D. Laveson | Jim M. Boardman |
| Linda B. Clapham | Ingaldson Fitzgerald P.C. |
| Carney Badley Spellman | 813 W. 3rd Avenue |
| 701 Fifth Avenue, Suite 3600 | Anchorage, AK 99501 |
| Seattle, WA 98104-5017 | |

☒ Via USDC CM-ECF system        ☒ Via USDC CM-ECF system

☐ Via U.S. Mail        ☐ Via U.S. Mail

☐ Via Messenger        ☐ Via Messenger

☐ Via email: kettrick@carneylaw.com        ☐ Via email: jim@impc-law.com

☐ Via email: laveson@carneylaw.com

☐ Via email: clapham@carneylaw.com

DATED *June 30, 2017* in Seattle, Washington.

*Nicole Plouf*
Nicole Plouf

CERTIFICATE OF SERVICE
**Case No. 3:15-cv-00137-TMB**